STATE OF NORTH CAROLINA v. GREGORY DONNELL MEBANE, DEFENDANT-
APPELLANT, AND STATE OF NORTH CAROLINA v. FRED WRIGHT,
DEFENDANT-APPELLANT

No. 9115SC288

(Filed 7 July 1992)

1. **Jury § 2.1 (NCI3d)— jury selection—additional jurors—only 4 of 50 summoned—cross section of community**

   The trial court did not abuse its discretion and there was no plain error of constitutional proportions in a rape and kidnapping prosecution where it became apparent one morning during jury selection that there might not be enough jurors in the original pool to complete jury selection; the judge ordered the clerk to draw 50 additional names from the list of prospective jurors and directed the sheriff to serve as many summonses as possible by 4:00 p.m.; both the State and the defendants had passed 11 jurors by 4:00 p.m. and the jury pool was depleted; only four of the 50 supplemental jurors had been served and reported for jury duty; all were white males; defendants did not object to the continuing selection of jurors; and the one remaining jury seat was filled. N.C.G.S. § 9-11(b) neither explicitly nor impliedly requires the judge to wait a certain amount of time so that a particular number of summonses can be served. Furthermore, there is no plain error of constitutional proportions because defendants challenge the result rather than the method of composition for the jury pool, and defendants present no evidence whatsoever of a systematic exclusion of any persons to make out a prima facie Sixth Amendment violation.

   **Am Jur 2d, Jury § 159.**

2. **Jury § 7.14 (NCI3d)— jury selection—peremptory challenges— racial discrimination**

   The trial court correctly found in a rape and kidnapping prosecution that the State had rebutted any inference of pur-

poseful racial discrimination in its use of peremptory challenges during jury selection where excused jurors had convictions or were under investigation by the Alamance County Sheriff's Department, had relatives charged by Alamance County officials, knew witnesses, or expressed reservations about being able to return a guilty verdict.

**Am Jur 2d, Jury § 233.**

3. **Criminal Law § 481 (NCI4th) — jury selection — jurors discussing case — no error**

The trial court did not abuse its discretion in a rape and kidnapping prosecution by finding that two jurors had not discussed the case and by permitting them to serve as jurors where it was brought to the court's attention prior to impanelling that two of the jurors had allegedly discussed the case during a recess; defendant Mebane's girlfriend testified that she had overheard two jurors talking about the case and that one had said "They look guilty"; the court conducted a voir dire of both jurors; one admitted saying that this looked like a big case, but denied expressing an opinion as to the guilt of defendants; the other juror denied having had a conversation with any other juror concerning the case; and both jurors indicated that they could be completely fair and impartial about the case.

**Am Jur 2d, Jury § 294.**

4. **Criminal Law § 491 (NCI4th) — rape and kidnapping — jury view — denied — no error**

The trial court did not err in a rape and kidnapping prosecution by denying defendant Wright's motion for a jury view of the rape scene where both the State and defendant introduced several diagrams and photographs of the scene and a view of the scene was not necessary.

**Am Jur 2d, Trial § 259.**

5. **Evidence and Witnesses § 397 (NCI4th) — rape and kidnapping — subornation of perjury by defendant's father — irrelevant — admission not prejudicial error**

There was no prejudicial error in a rape and kidnapping prosecution where a State's witness testified that defendant Wright's father attempted to bribe her to testify falsely. The

bribe was by the defendant's father and not the defendant, and therefore the evidence was of a collateral matter and irrelevant to guilt of the crimes charged, but the State did not focus on the testimony, the defense called two witnesses to refute the allegation, and the case did not turn on the improperly admitted evidence.

**Am Jur 2d, Evidence § 293.**

**Admissibility in criminal case as issue of defendant's guilt, evidence that third person has attempted to influence a witness not to testify or to testify falsely. 79 ALR3d 1156.**

6. **Evidence and Witnesses § 115 (NCI4th) — kidnapping and rape — suggestion of guilt of another man — introduction of the other man's timecard — no error**

The trial court did not err in a prosecution for kidnapping and rape by admitting the timecard of the victim's former boyfriend for the night of the crime where defendant had elicited testimony to suggest that the former boyfriend had either been the assailant or had had consensual intercourse with the victim that night. The timecard was relevant to demonstrate that the former boyfriend was working that night and could not have had sex with the victim, and was admissible under the business records exception to the hearsay rule. N.C.G.S. § 8C-1, Rules 401 and 803(6).

**Am Jur 2d, Evidence § 945.**

7. **Rape and Allied Offenses § 5 (NCI3d) — rape — evidence sufficient**

The trial court correctly denied defendants' motion to dismiss charges of first-degree rape where the victim testified to many acts of vaginal intercourse by defendants to which she did not consent, recounted threats by defendants to hurt her with a butcher knife unless she cooperated, and explained how the defendants held her arms and legs as each attempted vaginal intercourse and achieved some penetration. N.C.G.S. § 14-27.2.

**Am Jur 2d, Rape § 88.**

8. **Kidnapping § 1.2 (NCI3d) — kidnapping and rape — sufficiency of evidence of kidnapping**

The trial court did not err by denying defendant's motion to dismiss first-degree kidnapping charges in a prosecution

for rape and kidnapping where the facts met the requirements of N.C.G.S. § 14-39(a) and N.C.G.S. § 14-39(b) in that the victim testified that defendant Mebane called her into the back bedroom where he locked the door and began fondling her; he later allowed codefendants Wright and Yellock to enter the room since she would not cooperate; defendant Wright blocked the door and defendant Yellock forced her against a window where he grabbed her arms; the men then dragged her down the hallway into the living room; and, when she wrestled herself away from them, defendant Mebane hurried to the front door and locked it.

**Am Jur 2d, Abduction and Kidnapping §§ 11 et seq.**

9. **Constitutional Law § 200 (NCI4th) — rape and kidnapping — no double jeopardy**

There was no double jeopardy violation in a rape and kidnapping prosecution where defendants failed to object on double jeopardy grounds to the trial court's acceptance of the verdicts and did not make a motion to arrest judgment on either conviction and, even if the Court of Appeals opted to review the issue, the record reflects a series of sexual assaults by defendants upon the victim as they took turns having intercourse with her. No double jeopardy arises if the trial court properly instructed the jury that the same sexual assault predicating the rape charge could not be used to convict the defendants of first-degree kidnapping, and it is presumed that the jury was properly instructed because the instructions were not included in the record on appeal.

**Am Jur 2d, Criminal Law § 277.**

APPEAL by defendants from Judgments entered 8 August 1990 by *Judge J. B. Allen, Jr.*, in ALAMANCE County Superior Court. Heard in the Court of Appeals 7 January 1992.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General George W. Boylan, for the State.*

*Loflin & Loflin, by Thomas F. Loflin, III, for defendant appellants.*

COZORT, Judge.

Defendants Gregory Donnell Mebane and Frederick Wright were convicted of first-degree rape and first-degree kidnapping. Defendants jointly assert the trial court committed reversible error in its rulings relating to jury selection and to evidentiary issues raised at trial. Additionally, defendant Wright raises separately two issues for determination regarding his motion for a jury view of the rape scene and his challenge of testimony by a State's witness which tended to show his father had attempted to bribe the witness prior to trial. We conclude both defendants received a fair trial free from prejudicial error.

The State's evidence at trial tended to show the charges arose out of events which occurred on the evening of 28 July 1989 between the defendants; a third codefendant, Timothy Dion Yellock; and the victim. (Although the three defendants were tried jointly, defendant Yellock's appeal, No. 9115SC273, was not consolidated with the appeal of Mebane and Wright. Yellock's appeal is the subject of a separate opinion filed this same date.) The State's case rested primarily on testimony elicited from the victim. She testified that on 28 July 1989, Mebane and Yellock telephoned her and invited her to ride with them to Greensboro where they would pick up another girl. The victim, who was a casual acquaintance of both men, agreed. At approximately 6:00 p.m., Mebane and Yellock, along with defendant Wright, arrived at the victim's home. The victim told her mother she would return in an hour or so. When the four began heading toward Burlington rather than Greensboro, Mebane told the victim they needed to stop briefly at his home so he could change clothes. They stopped at an Amoco filling station near Interstate 85 where they purchased gas and beer. Upon arrival at Mebane's home, Mebane and Yellock retreated to the back of the house to refrigerate the beer. The victim and Wright sat down to watch television. Wright put a videocassette into the VCR; the movie was a pornographic film. Wright asked the victim, "You like that, don't you . . . ?" The victim responded by shrugging her shoulders and saying nothing.

After a few minutes, defendant Mebane yelled from the back of the house for the victim to "Come here. I want to talk to you about something." The victim walked into the bedroom where Mebane locked the door, and began making sexual advances toward her. When the victim told Mebane to stop kissing and touching her,

he called to Yellock and unlocked the door. Yellock entered the room. Mebane then told Yellock, "She won't cooperate." The victim pleaded, "Just leave me alone. Don't touch me." She began backing up until she was against a window. Mebane and Yellock moved toward her. Wright, wearing only a shirt and his underwear, appeared from the hall and blocked the doorway. Yellock grabbed the victim, but she pushed him back. Yellock became angry, and Mebane told the victim, "If we wanted to rape you, we could. If we wanted to, we could overpower you." (The record shows the victim was 6'2½" tall and weighed approximately 186 pounds at the time of the incident). Although the victim begged the defendants to leave her alone, they took her by the arms and legs and dragged her into the living room. She broke away from them briefly, at which time Mebane locked the front door and Wright came into the room holding a butcher knife and said, "I'll bet she'll cooperate." Yellock and Mebane told the victim they would not let Wright harm her if she cooperated.

The victim told her assailants she was having her menstrual period, which Yellock confirmed by ripping the victim's blue jeans apart and checking her underwear. Wright said, "It don't matter; we have had sex with plenty of females with their period on." The men then threw the victim to the floor. Each defendant attempted to have vaginal intercourse with the victim three times. While one defendant was on top of the victim, the other two held the victim's arms and legs. Only Mebane could complete each act; the other two defendants achieved only partial penetration due to their failure to reach a full erection. Defendants attempted anal sex with the victim but were unsuccessful. At one point, Yellock inserted his penis into the victim's mouth. The three men left the victim lying on the floor when they went to the bathroom to shower. Later, the defendants made the victim promise she would not tell anyone what had happened or they would kill her. Defendants and the victim got back into the car and drove to Wright's house where he asked his father for some money. The defendants then took the victim to a nearby friend's house and left her.

The friend, Sophie Allen, testified that on the evening of 28 July 1989, the victim knocked on her door. The victim was crying and hysterical. She told Ms. Allen the defendants had raped her. Ms. Allen stated the victim smelled like beer and "sex." Ms. Allen and a friend named Antonio Hargrove drove the victim to the

hospital. Mr. Hargrove corroborated Ms. Allen's testimony. Dean Ward, an investigator with the Alamance County Sheriff's Department, interviewed the victim at Ms. Allen's trailer prior to going to the hospital. He testified the victim had scratches and welts on her face. She told the officer the defendants had raped her. When Officer Ward arrested defendant Mebane the following morning, he observed scratches on Mebane's chest and noticed a butcher knife on a bedroom dresser.

Lee Ann Ball, a registered nurse at Alamance Memorial Hospital, performed procedures for sexual assault upon the victim on the evening of 28 July 1989. According to Ms. Ball, the victim had abrasions on her face and left arm. The victim sobbed quietly during the procedure. Dr. John F. Jones, the emergency room physician, conducted a pelvic examination on the victim. The victim's vagina appeared irritated and contained sperm. Tests showed the victim was infected with gonorrhea and chlamydia which could have been contracted earlier than 28 July 1989.

Evidence for the defendants included testimony from defendant Greg Mebane and from several witnesses who testified as to the victim's reputation for sexual promiscuity in the community. Defendant Mebane testified that prior to 28 July 1989, the victim had performed oral sex on him in his mother's car at the North Park Community Center while two others, Connell Williams and Nicky Harris were present. He stated the day before the incident the three men telephoned the victim and discussed having sexual intercourse with her. On 28 July, the defendants again called the victim and talked to her about having sex with them. She told the defendants to come and get her. The defendants picked up the victim at her home and drove to Mebane's house where they watched a pornographic video tape. Defendant Mebane told the court the victim kept requesting that they rewind the tape to watch certain scenes again. After awhile, Mebane asked the victim to come back to the bedroom with him. She complied. Mebane said the victim performed oral sex on him at that time. Mebane stated he and the victim then went into the living room where the victim began disrobing. After the parties removed their clothing, each of the three defendants had consensual vaginal intercourse twice with the victim. Everyone showered except the victim; the four left soon afterward. Mebane recalled they stopped at Fred Wright's house so he could get money from his father. The victim

remained in the car. They drove the victim to Sophie Allen's trailer and left.

Eight witnesses, including two first cousins of the victim, testified for the defense concerning the victim's reputation in the community for habitual sexual activity. In summary, the testimony reflected that the victim liked to engage in group sexual intercourse with two or more men, had done so on a number of occasions, and had engaged in sex with at least one man in the presence of others on several occasions. This evidence was offered to show the victim consented to the sexual intercourse which occurred on the night of 28 July 1989. On cross-examination and rebuttal, the victim denied the witnesses' allegations. The victim did admit she had been expelled from Chowan College for having a male visitor in her dormitory room after visiting hours. She also stated she had had consensual sexual intercourse with a man named Thomas Leath during the summer of 1987.

Neither defendant Wright nor defendant Yellock testified. All defendants were convicted of first-degree rape and first-degree kidnapping and acquitted on the charge of first-degree sex offense.

[1] Both defendant Mebane and defendant Wright present three issues relating to jury selection. First, defendants argue the trial court committed reversible error by continuing the jury selection process to fill one remaining jury seat when the sheriff was able to serve only four jury subpoenas of the 50 additional names randomly drawn. During jury selection on the morning of 31 July 1990, it became apparent that there might not be enough potential jurors in the original jury pool to complete selection of the jury. The judge ordered the clerk to draw 50 additional names from the list of prospective jurors and directed the sheriff to serve as many jury summonses as possible by 4:00 p.m. When 4:00 p.m. arrived, both the State and the defendants had passed 11 jurors, and the jury pool was depleted. At that time, only four of the 50 supplemental jurors had been served and reported for jury duty. All were white males. The defendants did not object at trial to the continuing selection of the jurors, despite the fact that the defendants had exhausted all peremptory challenges before the new potential jurors' arrival. Technically, the defendants have failed to preserve this issue and have waived appellate review pursuant to Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure. Defendants argue nonetheless that they were denied their constitu-

tional guarantee of a jury pool drawn from a fair cross section of the community in violation of their rights to equal protection under the law. Defendants contend the trial court committed plain error. We do not agree.

N.C. Gen. Stat. § 9-11(b) (1986) provides, "The presiding judge may, in his discretion, at any time before or during a session direct that supplemental jurors or a special venire be selected from the jury list in the same manner as is provided for the selection of regular jurors." The defendants contend the trial judge abused his discretion by not waiting a reasonable period of time to allow for more than four summonses to be served. We find no abuse of discretion. The statute neither explicitly nor impliedly requires the judge to wait a certain amount of time so that a particular number of summonses can be served.

Furthermore, we find no plain error of constitutional proportions. First, the cases upon which defendants rely for their constitutional challenge are not applicable to the case below. Defendants cite the following cases to support their Fourteenth Amendment claims: *Whitus v. Georgia,* 385 U.S. 545, 17 L.Ed.2d 599 (1967); *Taylor v. Louisiana,* 419 U.S. 522, 42 L.Ed.2d 690 (1975); and *Duren v. Missouri,* 439 U.S. 357, 58 L.Ed.2d 579 (1979). These cases illustrate challenges of the *method* of selecting the *entire* jury pool for court sessions. Evidence in *Whitus, Taylor,* and *Duren* was presented to demonstrate equal protection violations because the jury selection schemes in force at the time of trial excluded jurors who were female or black. Our Supreme Court has stated with respect to a Fourteenth Amendment jury challenge: "The key to establishing a prima facie case of systematic exclusion is a statistical showing of underrepresentation plus a system of selection which allows the jury commission to exclude prospective jurors on account of race." *State v. Avery,* 299 N.C. 126, 133, 261 S.E.2d 803, 807-08 (1980). Defendants simply do not meet the burden articulated in *Avery.* Here, defendants do not challenge the *method* of how the jury pool was composed, but instead contest the *result* of this process.

Neither can defendants demonstrate how the judge's order violated the Sixth Amendment fair cross section requirement. In *Taylor,* the United States Supreme Court said, "[t]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor,* 419 U.S. at 528, 42 L.Ed.2d at 697. In *Duren,* the

Court held that to establish a prima facie violation of the fair cross section requirement a defendant must show that (1) the group alleged to be excluded is a distinctive group; (2) the representation of the group within the venire is not fair and reasonable with respect to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion in the jury selection process. The defendants here make no comparable challenge to that in *Duren* and even admit that "*it can be assumed the additional 50 names represented a fair cross section of the community by race and sex.*" (Emphasis added). Defendants argue that since only four of those people were served in time to show up at 4 p.m., all fairness which N.C. Gen. Stat. § 9-11(b) was made to insure was emasculated. Defendants present no evidence whatsoever of a systematic exclusion of any persons to make out a prima facie Sixth Amendment violation under *Duren*. Again, defendants do not question the process, only its result. We therefore find the trial court's procedure in selecting the final juror to have been entirely proper.

[2] Defendants next dispute the State's use of its peremptory challenges to excuse black jurors. Defendants contend the State improperly excluded black members from the jury in violation of the principles articulated in *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed.2d 69 (1986), and in *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987). The defendants bear "the burden of proving the existence of purposeful discrimination." *State v. Sanders*, 95 N.C. App. 494, 498, 383 S.E.2d 409, 412, *disc. review denied*, 325 N.C. 712, 388 S.E.2d 470 (1989). Once a prima facie *Batson* case is shown, the State can rebut any inference of racial motivation by stating on the record "legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L.Ed.2d 1027 (1989). In *State v. Burge*, this Court found the State to have presented legitimate reasons for its exclusion of six minority jurors where "[t]wo had had brothers who had been charged with cocaine offenses; one knew two of defendant's witnesses; two others knew defendant's parents and one of his attorneys; and the last one knew defendant's family and both of his attorneys." *Burge*, 100 N.C. App. 671, 674, 397 S.E.2d 760, 761 (1990), *disc. review denied and appeal dismissed*, 328 N.C. 272, 400 S.E.2d 456 (1991). In the case below, the State

used peremptory challenges to excuse seven black jurors. The trial court found the State to have rebutted any inference of purposeful discrimination by the State's recitation of the following reasons: One had been convicted of felonious breaking and entering some years earlier as the result of an investigation by the Alamance County Sheriff's Department; two had had first degree relatives charged with felonies by Alamance County officials; one had had a first degree relative who had been charged with DWI by Alamance County officials and additionally knew defense witnesses; one was subject to an ongoing investigation being conducted in part by State's witness Deputy Sheriff Dean Ward for selling alcoholic beverages without ABC permits; one knew two defense witnesses; and one knew the mother of a potential defense witness and expressed reservations about her ability to return a guilty verdict by stating she would "second-guess" her decision because life imprisonment was "too harsh" a sentence for rape. We agree with the trial court's decision that these reasons sufficiently rebutted any prima facie case of discrimination in jury selection.

[3] In the final issue relating to the jury, defendants contend the trial court committed prejudicial error in finding two jurors had not discussed the case and in permitting them to serve as jurors. Prior to impaneling the jury, it was brought to the court's attention that two of the jurors had allegedly discussed the case during a recess. Edie Lashanta McBroom, defendant Mebane's girlfriend, took the stand and testified she overheard two jurors, Mr. Massey and Mr. Moore, talking about the case outside the courthouse restroom. She testified she heard Mr. Massey comment [with reference to the defendants], "They look guilty." The court proceeded to conduct a voir dire examination of both jurors outside the presence of the rest of the jury. Mr. Massey denied having expressed an opinion as to the guilt or innocence of the defendants. He admitted saying, "This looks like it's going to be, you know, a pretty big case." Mr. Moore denied having had a conversation with any juror concerning the case. Both jurors also indicated they could be completely fair and impartial as to each defendant. The trial court made findings of fact that the jurors had not talked about the case and had not expressed opinions about the guilt or innocence of the defendants.

Defendants claim the trial court's failure to excuse the two jurors violated constitutional and statutory provisions. We find no error. Both the North Carolina and United States Constitutions

guarantee an individual's right to a fair trial by an impartial jury. U.S. Const. amend. VI; N.C. Const. art. I § 24. Additionally, N.C. Gen. Stat. § 15A-1212(6) and (9) (1988), provide:

> A challenge for cause to an individual juror may be made by any party on the ground that the juror:
>
> * * * *
>
> (6) Has formed or expressed an opinion as to the guilt or innocence of the defendant. It is improper for a party to elicit whether the opinion formed is favorable or adverse to the defendant.
>
> * * * *
>
> (9) For any other cause is unable to render a fair and impartial verdict.

Any removal of a potential juror for cause is a matter within the discretion of the trial court and is not reviewable except for an abuse of discretion. *State v. Kennedy*, 320 N.C. 20, 28, 357 S.E.2d 359, 364 (1987).

In the case below, the trial judge determined that the jurors had not discussed the case and had not formed an opinion as to the defendants' guilt or innocence. Moreover, notwithstanding a juror's opinion as to how the case should be decided, the juror may still serve if the court determines that the juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 6 L.Ed.2d 751, 756 (1961). *See also, State v. Corbett*, 309 N.C. 382, 307 S.E.2d 139 (1983). The transcript from the present case indicates that when questioned by the trial judge, the jurors stated unequivocally they could be completely fair and impartial. Consequently, we find no abuse of discretion by the trial judge in failing to excuse the two jurors for cause.

[4]   We turn now to the issues defendant Wright raises individually concerning the trial proceedings. Defendant Wright first contests the trial court's denial of his motion for a jury view of the rape scene. The decision to allow a motion for a jury view is within the sound discretion of the trial judge. *State v. Davis*, 86 N.C. App. 25, 32, 356 S.E.2d 607, 611 (1987). Defendant Wright argues the jury view would have assisted the jury in determining whether the victim's testimony as to the nature of the sex acts was credible.

We find the judge did not abuse his discretion by denying the motion. At trial, both the State and defendants introduced several diagrams and photographs of the scene as illustrative testimony. A view of the scene was not necessary and would not have aided the jury over and above the evidence provided. Therefore, the trial judge's ruling on this motion will not be disturbed.

[5] Defendant Wright further contends the trial court committed reversible error in admitting into evidence against defendant Wright testimony from a State's witness tending to show defendant Wright's father attempted to bribe the witness to testify falsely. Defendant Mebane joins in this argument. On direct examination, State's witness Sophie Allen testified that sometime during the summer prior to trial she went to defendant Wright's attorney's office to discuss the case. While she was waiting in the hallway, defendant Wright's father, Mr. Fred Carlton Wright, Sr., asked Ms. Allen to "say that his son did not rape [the victim]." He then gave Ms. Allen $100.00. Ms. Allen stated she told defendant Wright's counsel what had transpired and he told her "not to worry about it." The defendants objected generally to this testimony. The trial judge overruled the objection as to defendant Wright, and gave an instruction to the jury explaining they were not to consider the evidence against defendants Mebane and Yellock. Later, the trial court conducted a voir dire examination of defendant Wright's attorney, Mr. Craig T. Thompson. The trial judge then asked defendant Wright if he was satisfied with Mr. Thompson's representation in the matter and if he would allow Mr. Thompson to testify. In addition, the judge inquired whether defendants Mebane and Yellock objected to Mr. Thompson's testimony; neither objected. The State also had no objection. The trial court permitted Mr. Thompson to testify for the sole limited purpose of refuting Ms. Allen's testimony concerning what she had told the attorney about defendant Wright's father. Defendant Wright's father then testified about events which occurred on the night of 28 July 1989. He highlighted in detail the point in the evening when the four came to his house so his son could get some money, but he also discounted Ms. Allen's testimony tending to show he had bribed her to say his son had not committed rape.

Defendant Wright argues the admission of Sophie Allen's testimony caused him to suffer irreparable prejudice. Defendant Mebane contends that despite the judge's cautionary instruction, the admission of the evidence had a "trickle down" effect and

STATE v. MEBANE

[106 N.C. App. 516 (1992)]

the jury nevertheless improperly considered the evidence against him. Both defendants allege the admission of this evidence requires a new trial. We do not agree. Generally, evidence tending to show a defendant has attempted to induce a witness to testify falsely in his or her favor is relevant and admissible against the defendant. *State v. Minton*, 234 N.C. 716, 725, 68 S.E.2d 844, 850 (1952). In the case below, however, the purported bribe was made by defendant's father and not the defendant. We therefore acknowledge the evidence is testimony of a collateral matter and was irrelevant to prove the defendants' guilt of the crimes charged. We are not convinced, however, that the admission of the evidence necessitates a new trial.

A new trial will not be ordered automatically each time a court rules erroneously on the admissibility of evidence. *State v. Galloway*, 304 N.C. 485, 496, 284 S.E.2d 509, 516 (1981). The admission of irrelevant evidence will be treated as harmless error unless the defendant demonstrates he was so prejudiced by the erroneous admission that "a different result would have ensued if the evidence had been excluded." N.C. Gen. Stat. § 15A-1443(a) (1988); *State v. Harper*, 96 N.C. App. 36, 41, 384 S.E.2d 297, 300 (1989). In this case defendants have not met their burden of demonstrating that had the erroneously admitted testimony been excluded, a different result would likely have been reached. A careful review of the transcript discloses the insignificance of the alleged bribe in the trial proceedings as a whole. The State did not focus on the testimony, and the defense called two witnesses to refute the allegation. Furthermore, the case did not turn on the improperly admitted evidence, but rested instead primarily on the victim's testimony and the testimony of the several defense witnesses. Consequently, we find the admission of Sophie Allen's testimony relating to the alleged bribe to be harmless error.

[6] Next, both defendants contest the admission into evidence of John Pinnix's timecard for the pay period ending 29 July 1989. According to the victim, John Pinnix was her former boyfriend. She had not seen him for over a month prior to 28 July 1989 since they had "called it off." Defendants elicited testimony from various witnesses during the proceedings to suggest Mr. Pinnix had either been her assailant or had had consensual sexual intercourse with the victim that night. To explain Mr. Pinnix's whereabouts, the State offered into evidence his timecard which had been punched in at 2:52 p.m. and punched out at 11:10 p.m.

on 28 July 1989. Defendants argue the timecard was improperly admitted into evidence. We disagree.

Generally all relevant evidence is admissible. N.C. Gen. Stat. § 8C-1, Rule 402 (1988). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (1988). The timecard of John Pinnix in the case below was relevant to demonstrate he was working and could not have had sex with the victim on the night in question. The timecard was admissible as an exception to the hearsay rule under N.C. Gen. Stat. § 8C-1, Rule 803(6) (1988) which exempts "business records." Business records are appropriately admitted into evidence when "a proper foundation . . . is laid by testimony of a witness who is familiar with the . . . records and the methods under which they were made so as to satisfy the court that the methods, the sources of information, and the time of preparation render such evidence trustworthy." *State v. Springer*, 283 N.C. 627, 636, 197 S.E.2d 530, 536 (1973). The record below indicates the proper foundation was laid to admit the timecard. The director of manufacturing of Pinnix's employer, who was "familiar with the timecard records and procedures in recording the time that employees work," described in detail the procedures used.

[7]  The defendants next contend the trial court erred by not dismissing the first-degree rape and first-degree kidnapping charges for insufficiency of the evidence. The test for ruling on a motion to dismiss is "whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense." *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). The trial court must consider all the evidence taken in the light most favorable to the State to determine whether substantial evidence exists. *State v. Perry*, 316 N.C. 87, 95, 340 S.E.2d 450, 456 (1986). Substantial evidence is "evidence from which any rational trier of fact could find the fact to be proved beyond a reasonable doubt." *State v. Sumpter*, 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986). The test for sufficiency of the evidence is the same regardless of whether the evidence is circumstantial or direct. *State v. Earnhardt*, 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982).

The statute proscribing the offense of first-degree rape reads:

STATE v. MEBANE

[106 N.C. App. 516 (1992)]

(a) A person is guilty of rape in the first degree if the person engages in vaginal intercourse:

\* \* \* \*

(2) With another person by force and against the will of the other person, and:

    a. Employs or displays a dangerous deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon; or

\* \* \* \*

    c. The person commits the offense aided and abetted by one or more other persons.

N.C. Gen. Stat. § 14-27.2 (1986). The evidence in the present case is sufficient on first-degree rape. First, the victim testified to many acts of vaginal intercourse by the defendants to which she did not consent. She recounted the threats by the defendants to hurt her with a butcher knife, which was found at the scene, unless she "cooperated." Second, the victim explained how the defendants held her arms and legs as each attempted vaginal intercourse and achieved some penetration. Therefore, the trial court's denial of defendants' motion to dismiss the first-degree rape charges must be upheld.

[8] The kidnapping statute provides:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person . . . shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

\* \* \* \*

(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

\* \* \* \*

(b) There shall be two degrees of kidnapping as defined by subsection (a). If the person kidnapped either was not released by the defendant in a safe place or had been seriously

injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class D felony.

N.C. Gen. Stat. § 14-39 (Cum. Supp. 1991). According to the North Carolina Supreme Court, it was not the Legislature's intent "to make a restraint which was an inherent, inevitable element of another felony, such as armed robbery or rape, a distinct offense of kidnapping thus permitting conviction and punishment for both crimes." *State v. Irwin*, 304 N.C. 93, 102, 282 S.E.2d 439, 446 (1981). It is true some restraint is inherent in the crime of rape. However, the restraint, confinement, and asportation of a rape victim may constitute kidnapping if it is a separate, complete act, independent of and apart from the rape. *State v. Walker*, 84 N.C. App. 540, 543, 353 S.E.2d 245, 247 (1987). For the kidnapping convictions to be upheld, the initial inquiry begins with subsection (a). We must determine whether there was substantial evidence that the defendants restrained or confined the victim separate and apart from any restraint necessary to accomplish the acts of rape. We conclude it does. The victim testified that defendant Mebane called her into the back bedroom where he locked the door and began fondling her. She stated he later allowed codefendants Wright and Yellock to enter the room since she would not "cooperate." Defendant Wright blocked the door, and defendant Yellock forced her against a window where he grabbed her arms. The men then dragged her down the hallway into the living room. When she wrestled herself away from them, defendant Mebane hurried to the front door and locked it. These facts meet the requirements of N.C. Gen. Stat. § 14-39(a) and are substantial evidence from which the jury could infer the victim was kidnapped. In addition, the evidence supports a verdict of kidnapping in the first degree pursuant to subsection (b). The facts in this case, as explained earlier, are evidence from which the jury could reasonably decide the victim was sexually assaulted pursuant to the statute. We thus determine the trial court committed no error in denying defendants' motion to dismiss the first-degree kidnapping charges.

[9] Finally, defendants argue the trial court should have arrested judgments on either the first-degree kidnapping or the first-degree rape convictions. Defendants failed to object on double jeopardy grounds to the trial court's acceptance of the verdicts, and they did not make a motion to arrest judgment on either conviction. Ordinarily, defendants would have forfeited any right to raise this issue on appeal. *State v. Dudley*, 319 N.C. 656, 659, 356 S.E.2d

361, 364 (1987). In *Dudley*, the defendant failed to move to arrest judgment, on double jeopardy grounds, on his conviction of first-degree kidnapping, first-degree rape, or attempted rape. Our Supreme Court, however, chose to review the double jeopardy issue in *Dudley* pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure despite the defendant's failure to object at trial. In *Dudley*, the defendant was convicted of two counts of first-degree rape and one count of first-degree kidnapping of one victim. *State v. Freeland*, 316 N.C. 13, 340 S.E.2d 35 (1986), holds that an individual may not be convicted of both sexual assault and kidnapping if the sexual assault has to be proved to form the basis of the kidnapping conviction. Based on *Freeland*, the *Dudley* court determined the defendant was entitled to have the judgment arrested as to one of the charges. *Dudley*, 319 N.C. at 660, 356 S.E.2d at 364.

Even if we opted to review the double jeopardy issue as the Court did in *Dudley*, we reach a different result here. The record below reflects a series of sexual assaults by defendants upon the victim as they took turns having intercourse with her. Each distinct act of forcible intercourse with a single victim constitutes a separate offense rather than one continuous sexual assault. *Id.* at 659, 356 S.E.2d at 363. If the trial court properly instructed the jury that the same sexual assault predicating the rape charge could not be used to convict the defendants of first-degree kidnapping, no double jeopardy situation arises. Defendants elected not to include in the record on appeal the trial court's instructions to the jury. Accordingly, we "presum[e] that the jury was properly instructed as to the law arising upon the evidence as required by G.S. § 1-180." *State v. Hedrick*, 289 N.C. 232, 234, 221 S.E.2d 350, 354 (1975). Defendants therefore cannot establish error on appeal.

After having reviewed all issues presented by defendants Mebane and Wright, we find

No error.

Judges EAGLES and ORR concur.